**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | |
| | : | **Case No. 1:21-cr-648 (RBW)** |
| **ADAM JOHNSON,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Adam Johnson ("Johnson") to 90 days' imprisonment, one year of supervised release, a $5,000 fine, $500 in restitution, and 60 hours of community service.

## I.      Introduction

The defendant, Adam Johnson, traveled to Washington, D.C. from Florida and participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 presidential election, injured more than one hundred law enforcement officers, and resulted in more than $1 million in property damage.

On November 22, 2021, Johnson pleaded guilty to one count of violating 18 U.S.C. § 1752(a): Entering and Remaining in a Restricted Building or Grounds, a Class A misdemeanor. As explained herein, the government's proposed sentence, which includes a term of incarceration, is appropriate in this case because of the numerous and severe aggravating circumstances in this case. In particular, Johnson: (1) ran towards the Capitol after hearing it had

1

been breached; (2) recorded a video of rioters assaulting and disarming police officers outside the Capitol; (3) witnessed officers use tear gas and flash bang devices to disperse the crowd and yet persisted in breaching the Capitol through the Senate Wing Door, alongside rioters who were entering through a smashed window; (4) ascended a staircase to the second floor and traveled all the way to the doors to the House Chamber; (5) tried to open a door he believed was to Speaker Pelosi's office, shortly after her staffers had barricaded themselves against the mob just across the hall; (6) temporarily stole and carried the Speaker's podium to the Rotunda for a "photo op"; (7) formed part of a mob that overwhelmed a line of police guarding the entryway to the House Chamber and crushed officers during its advance; (8) witnessed rioters attempt to break down the doors to the House Chamber and encouraged them to do so by shouting that a bust of George Washington would make "a great battering ram"; and (9) destroyed evidence by deleting videos and photographs from his cell phone as well as his entire Facebook account.

　　　To be clear, in arriving at its sentencing recommendation, the government also considered several mitigating factors, including Johnson's voluntary surrender to the FBI just two days after the riot, his early and robust cooperation with law enforcement,[1] and his willingness to accept responsibility and enter a plea or cooperation agreement at the first available opportunity.

　　　Notwithstanding the above, even if he did not personally engage in violence during the riot, Johnson encouraged his fellow rioters to engage in property destruction and was part of a mob that pushed its way past Capitol police officers to get closer to the House Chamber.  For over ten minutes, he watched his fellow rioters attempt to force entry to the House Chamber,

---

[1] The defendant cooperated with law enforcement from the beginning of this investigation, including by providing a voluntary and fulsome interview on January 15, 2021, and turning his cell phone over to the FBI, but only after he had deleted inculpatory images and videos from it.

where members of Congress were barricaded, terrified, inside.  And worse yet, Johnson was aware they were still inside.  Although he has since demonstrated what appears to be genuine remorse for his conduct, Johnson's initial instinct was to celebrate his actions by sharing his photos and videos of the riot via Facebook.

As with scores of other defendants, Johnson's conduct on January 6th took place within the context of a violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt congressional proceedings integral to the peaceful transfer of power.  But for his actions alongside so many others, the breach of the Capitol likely would never have happened.  *See, e.g.*, *United States v. Lori Vinson*, 1:21-cr-355 (RBW), Oct. 22, 2021 Hr'g Tr. at 63 ("I think everybody has a responsibility who was involved for what occurred [on January 6].").  In light of Johnson's participation in a riot that succeeded in halting the certification of the 2020 election, his encouragement of violent conduct, his attempt to enter the Speaker's office, and the need to deter future political violence, a jail sentence is both necessary and appropriate in this case.

## II.     Factual and Procedural Background

### a.    *The January 6, 2021 Attack on the Capitol*

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol.  *See* Statement of Offense ("SOO")), ECF No. 39, at 1-3.  As this Court knows, a riot cannot occur without rioters, and each rioter's actions contributed to the violence and destruction of that day.

### b.    *Johnson's Role in the January 6, 2021 Attack on the Capitol*

On January 5, 2021, Johnson traveled to Washington, D.C. from Tampa, Florida, accompanied by a friend, to attend the political rally in support of former President Trump on

January 6, 2021.  Johnson was aware that the Electoral College votes would be counted on January 6 at the U.S. Capitol.  On the evening of January 5, Johnson and his friend attended a rally in D.C., where Johnson was captured shouting, "Who's f****** country?"  *See* Ex. 1.[2]  He also posted a photograph of himself looking gleeful at the rally to his Facebook, alongside the caption, "Riot!!!"  *See* Figure 1.



*Figure 1*

On the morning of January 6, 2021, Johnson and his friend walked to the "Stop the Steal" rally in downtown D.C.  There, he listened to speeches by the former president, Rudy Giuliani, and Representative Mo Brooks, the latter whom Johnson heard state that it was time for action and violence.[3]  SOO ¶ 10.  Johnson believed these statements resonated with the crowd, as he observed people nodding their heads in agreement.  *See id.*

---

[2] All government exhibits have been pre-marked to be shown during the sentencing hearing. This particular moment is documented in a Washington Post montage on the Capitol riot, at the 36 second mark, and is publicly available at https://www.youtube.com/watch?v=mlRfxdt5_cY).

[3] Although Johnson did not identify Representative Brooks by name in his proffer, he was very likely referring to Brooks, who told the crowd to "start taking down names and kicking ass" and stated that their ancestors had sacrificed their "blood, their sweat, their tears, their fortunes, and sometimes their lives."  *See Mo Brooks Gives Fiery Speech Against Anti-Trump Republicans,*

Johnson and his friend then began marching to the Capitol.  While marching, Johnson heard someone say "Pence didn't do it"—a reference to former Vice President Pence not rejecting the Electoral College vote tallies of certain states as some hoped he would do.  *See id.* ¶ 11.  Johnson also saw police running towards the Capitol and heard people shout, "they broke into the Capitol!"  Rather than steering clear of the "break in," Johnson and his friend *ran* to join the crowd advancing on the Capitol.  *See id.*

Upon arriving on Capitol grounds, Johnson observed members of the mob assaulting police, who had donned shields and riot gear.  He witnessed the police use tear gas and flash bangs in attempts to disperse the crowd.  *Id.* ¶ 12.  Johnson was so close to the police perimeter that the tear gas made his eyes sting and prompted him to comment, "that tear gas was rough." *See id.*; *see also* Ex. 2.  Johnson even recorded a video of a rioter grabbing a police officer's baton.  SOO ¶ 12.

Undeterred by the violent clashes and law enforcement officers' clear attempts to hold back the crowd, Johnson climbed the scaffolding set up for the presidential inauguration and recorded a video from the top.  He then breached the Capitol through the Senate Wing door, at approximately 2:20 p.m., while holding up his phone to record the moment.  *See* Figure 2.  To be clear, Johnson knew he was trespassing when he entered the building.  SOO ¶ 26.  As he entered, rioters were climbing through a window that had been smashed only moments earlier.  *See* Figure 2.  He then entered a Senate Wing office.  *See* Ex. 3 and Figure 3.

---

*Socialists*, THE HILL (Jan. 6, 2021), *available at* https://www.youtube.com/watch?v=ZKHwV6sdrMk&t=411s (video of full speech).  Brooks asked the crowd if they were "willing to do the same" and instructed them to "carry the message to Capitol Hill."  *See id.*



*Figure 2*



*Figure 3*

As he continued through the Capitol, Johnson stopped near a sign that read: "Closed to all tours." He asked someone to take a picture of him posing with the sign, which he later posted on his Facebook account along with the caption, "No"—as if in response to the sign. *See* Figure 4.





*Figure 4*

Johnson continued on his march through the Capitol, following a sign for Speaker Pelosi's office

suite.  SOO ¶ 17.  He entered the suite and jiggled the handle to an office that he believed

belonged to Speaker Pelosi, but it was locked.  *See id*; *see also* Ex. 4 and Figure 5.  Just across

the hall and only twelve minutes earlier, several of the Speaker's staffers had barricaded

themselves in a different office, terrified.[4]



*Figure 5*

---

[4] Footage of Speaker Pelosi's staffers running for cover in an office in that hallway is available publicly here: https://www.usatoday.com/videos/news/politics/2021/02/12/capitol-riot-footage-nancy-pelosis-staffers-barricade-themselves/6728559002/.  *See also* HBO, *Four Hours at the Capitol* (2021) (interview with Speaker Pelosi staffer barricaded in above-mentioned office).

Shortly thereafter, Johnson located the Speaker's podium near a spiral staircase and carried it to the Rotunda for a now viral photo op with his "prop."  *See* Figure 6; SOO ¶ 18.  He placed the podium in the center of the Rotunda, where he posed for pictures and pretended to make a speech.  *See* Ex. 5.



*Figure 6*

At approximately 2:32 p.m., Johnson entered a hallway leading to the House Chamber, where dozens of rioters were standing behind a line of approximately ten U.S. Capitol Police officers.  The rioters shouted several times, "let's go!"  Members of the crowd then began pushing forward against the police line, propelling the crowd, including Johnson, forward.  *See* Exs. 3, 6, 7; Figure 7.[5]  Johnson does not appear to be actively pushing in the video, but he did not resist or seek to extricate himself from the crowd either.

To the contrary, Johnson followed the crowd to a small vestibule featuring a set of doors to the House Chamber and a bust of George Washington, where he stayed for at least twelve minutes.[6]  At some point during this time, someone told Johnson that members of Congress were

---

[5] Johnson was approximately five rows back from the police line, as seen in Figure 7.  U.S. Capitol Police officers can be seen guarding the entryway toward the bottom of the frame.

[6] Capitol surveillance footage shows that Johnson entered the corridor in front of the House Chamber at approximately 2:35 p.m. and did not depart until after smoke had been discharged at approximately 2:47 p.m.

"still in the room."  Johnson watched rioters banging against the doors to the House Chamber—where some members of Congress remained trapped, unable to evacuate—and chanting "stop the steal" and "break it down."  *See* Exs. 3, 8 and Figure 8.[7]



*Figure 7*



*Figure 8*

---

[7] *See* Peter Hall et al., *"The Scariest Time of My Life": Rep. Susan Wild from Lehigh Valley Recounts Harrowing Episode Inside the Capitol*, Pittsburg Post-Gazette (Jan. 7, 2021), *available at* https://www.post-gazette.com/news/state/2021/01/07/Congresswoman-Susan-Wild-Lehigh-Valley-pennsylvania-recounts-Capitol-riots/stories/202101070115.

Johnson witnessed police officers, armed with riot gear, being crushed in this area and heard a man with a megaphone shouting, "let them out!"  *See* Ex. 3.  He stood by watching as rioters used flag poles and other items to try to break down the House Chamber doors, on the other side of which armed law enforcement officers stood guard as the last line of defense between the mob and Members of Congress.  *See id.* and Figures 9-10.  During this melee, Johnson shouted that the Washington bust would be "a great battering ram."  *See* Ex. 9. Thankfully, no one heeded his suggestion.



*Figure 9*



*Figure 10*[8]

---

[8] This photograph depicts the other side of the House Chamber doors as rioters attempted to force entry and is publicly available here:  https://www.businessinsider.com/congress-capitol-police-guns-drawn-standoff-house-chamber-trump-supporters-2021-1.

Several minutes later, a rioter discharged white smoke from what Johnson believed was a fire extinguisher.  Only at this point did Johnson move away from the rioters trying to breach the House Chamber.  *See* Ex. 10.  He briefly returned to the corridor to continue watching the rioters' efforts to break down the door, at which point someone discharged the white smoke again, prompting him to walk away and ultimately depart the Capitol at approximately 2:55 p.m.  *See* Figure 11.  In total, Johnson spent 35 minutes inside of the Capitol.



*Figure 11*

  c. *JOHNSON's Actions After the Riot on January 6*

Johnson ultimately traveled back to Florida via a rental car, as opposed to taking his scheduled flight home, because he knew there likely would be consequences for his unlawful entry into the Capitol.  By January 7, 2021, he had deleted the media items pertaining to the Capitol riot from his phone as well as his Facebook account.

In the days following the riot and leading up to his arrest, Johnson exchanged several texts with friends and family regarding the events of January 6.  He bragged that he "broke the internet" and was "finally famous," presumably in reference to the photo of himself carrying the podium that went viral.  Minimizing his conduct at the Capitol, he stated, "I peacefully entered

and peacefully left"; "I truly believe it was my responsibility as a citi[zen]";[9] "I was not an agitator"; "I was outside the doors [where the session was held] but never entered"; and "I was there to record history, I was there to know."

Finally, in the midst of plea negotiations, the government received a tip that Johnson intended to capitalize on his criminal activities in the Capitol by publishing a memoir of some sort. This development led to the inclusion of a unique provision in the plea agreement pursuant to which Johnson agreed to assign to the United States any profits derived from statements published in books, interviews, and the like, or from products bearing his name or likeness, for a period of five years.

### d. *The Charges and Plea Agreement*

On January 8, 2021, Johnson was charged by complaint with violating 18 U.S.C. §§ 641 and 1752(a) as well as 40 U.S.C. §§ 5104(e)(2). He self-surrendered to the FBI that same day. On October 27, 2021, Johnson was charged by Information with violating 18 U.S.C. § 1752(a)(1), and on November 22, 2021, he pleaded guilty to that count. By plea agreement, Johnson has agreed to pay $500 in restitution to the Department of the Treasury.

## III.   Statutory Penalties

Johnson now faces a sentencing on a single count of violating 18 U.S.C. § 1752(a). As noted by the plea agreement and the U.S. Probation Office, Johnson faces up to one year of imprisonment and a fine of up to $100,000. Johnson must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

---

[9] Unfortunately, because Johnson deleted most content related to the Capitol riot from his phone, law enforcement was only able to recover remnants of relevant text threads.

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49.

The government agrees with the Probation Office's calculation of the applicable Sentencing Guidelines range:

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2B2.3(a)) | 4 |
| Specific Offense Characteristics (U.S.S.G. § 2B2.3(b)(1)(A))[10] | 2 |
| Acceptance of Responsibility (USSG §3E1.1(a)) | -2 |
| **Total Adjusted Offense Level** | **4** |

*See* PSR at ¶¶ 41-47.

The U.S. Probation Office calculated Johnson's criminal history as a category I, which is not disputed. PSR at ¶ 50. Accordingly, the U.S. Probation Office calculated Johnson's total adjusted offense level, after acceptance, at 4, and his corresponding Guidelines imprisonment range at 0-6 months. PSR at ¶ 93. Johnson's plea agreement contains an agreed-upon Guidelines calculation that mirrors the U.S. Probation Office's calculation.

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *United*

---

[10] The PSR incorrectly states that this specific offense characteristic applies because the trespass occurred "at a secure government facility" under U.S.S.G. § 2B2.3(b)(1)(A)(i). PSR ¶ 32. As indicated in Johnson's plea agreement, the specific offense characteristic instead applies because the trespass occurred "at any restricted building or grounds" under U.S.S.G. § 2B2.3(b)(1)(A)(vii). ECF No. 38 at 3. On January 6, 2021, the U.S. Capitol was restricted because protectees of the United States Secret Service were visiting. *See* 18 U.S.C. § 1752(c)(1)(B). Because a two-level increase applies under either theory, there is no difference to the final offense level.

*States v. Rita*, 551 U.S. 338, 349 (2007).  As required by Congress, the Commission has

"modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding

inconsistency, complying with congressional instructions, and the like."  *Kimbrough v. United*

*States*, 552 U.S. 85, 96 (2007) (internal quotation marks omitted); 28 U.S.C. § 994(m).  In so

doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data

and national experience, guided by professional staff with appropriate expertise,'" and "to

formulate and constantly refine national sentencing standards."  *Kimbrough*, 552 U.S. at 108.

Accordingly, courts must give "respectful consideration to the Guidelines."  *Id.* at 101.  As the

Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States
> Sentencing Commission's in-depth research into prior sentences,
> presentence investigations, probation and parole office statistics,
> and other data. U.S.S.G. §1A1.1, intro, comment 3. More
> importantly, the Guidelines reflect Congress's determination of
> potential punishments, as set forth in statutes, and Congress's
> on-going approval of Guidelines sentencing, through oversight of
> the Guidelines revision process. See 28 U.S.C. § 994(p) (providing
> for Congressional oversight of amendments to the Guidelines).
> Because the Guidelines reflect the collected wisdom of various
> institutions, they deserve careful consideration in each case.
> Because they have been produced at Congress's direction, they
> cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005).  "[W]here judge and Commission *both*

determine that the Guidelines sentences is an appropriate sentence for the case at hand, that

sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary'

requirement)," and that *significantly* increases the likelihood that the sentence is a reasonable

one."  *Rita*, 551 U.S. at 347 (emphasis in original).  In other words, "the Commission's

recommendation of a sentencing range will 'reflect a rough approximation of sentences that

might achieve § 3553(a)'s objectives.'"  *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all of the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to a Guidelines analysis. In order to reflect Congress's will, the Guidelines will be a powerful driver of consistency and fairness moving forward.

## IV.   Sentencing Factors Under 18 U.S.C. § 3553(a)

In this Class A misdemeanor case, sentencing is also guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.  § 3553(a)(6). In this case, as described below, most of the section 3553(a) factors weigh in favor of incarceration.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, as we now discuss, this Court should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances. As they entered the Capitol, they

would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob.  Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement officials and smelled chemical irritants in the air. No rioter was a mere tourist that day.

Additionally, while looking at Johnson's individual conduct, this Court must assess such conduct on a spectrum.  In determining a fair and just sentence on this spectrum, this Court should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated sincere remorse or contrition.  While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

To be clear, had Johnson personally engaged in violence or outright property destruction— he did, of course, temporarily convert the Speaker's podium to his own use—he would be facing additional charges and/or penalties associated with that conduct.

When Johnson and his friend descended on the Capitol, they knew that it would be violent. Indeed, upon learning that the Capitol had been breached and witnessing police run towards it, they, too, ran towards the Capitol.  As the Statement of Offense shows, Johnson was well aware of the force required to overwhelm law enforcement officers and ultimately make entry into the Capitol.  He admitted to witnessing rioters assault law enforcement outside the Capitol, including

by disarming a police officer of his baton.  Indeed, Johnson recorded this moment, suggesting that he condoned the conduct and believed it was worthy of a trophy video.  He admitted to being so close to the police line that his eyes stung from tear gas.  And despite the officers' very obvious attempts to hold the crowd back, Johnson chose to surge ahead, climbing the scaffolding before entering the Capitol.

Johnson entered the building less than ten minutes after it was first breached at his location of entry.  While no police officers blocked his path, there were clear signs of violent entry.  The window adjacent to the door through which Johnson entered had just been smashed out.  Indeed, rioters were climbing through this window the very moment he entered the building.  Johnson would have heard the alarm sounding throughout the Capitol Rotunda and its antechamber: a loud, high-pitched, continuous beeping similar to a smoke alarm.  He was aware that police on Capitol grounds were attempting to hold the mob back using tear gas and flash bangs.

Perhaps what most sets this case apart from other misdemeanor Capitol riot cases is that even after Johnson witnessed rioters breach a police line just outside the House Chamber, crushing officers in the midst, he did not turn back.  He was undeterred by his fellow rioters' attempts to break down the doors to the House Chamber, where Johnson believed members of Congress were still counting votes.  Indeed, he stood by *for over ten minutes* watching their efforts and even encouraged them to use a bust of George Washington to smash the House doors open.  Johnson only left this area when a rioter discharged a fire extinguisher on a pair of officers.  Even then, he ambled around for a few more minutes before finally exiting the Capitol at 2:55 p.m.

The figures and exhibits described above encapsulate Johnson's posture on that day—he observed and encouraged violence, and he capitalized on it by unlawfully breaching the Capitol all the way to the House Chamber doors.  Johnson's actions that day also, frankly, illustrate his

sense of entitlement and privilege.  The now-viral podium photo portrays Johnson as confident, arguably gleeful, while converting government property to his own use during an unlawful siege of the Capitol.  And in Figure 4 above, Johnson appears defiant and righteous in his trespassing, which he celebrated by posting this photo to Facebook.

During his two proffer sessions, Johnson expressed what the government believes is sincere remorse.  But these declarations came only after he was charged for his role in the riot at the Capitol on January 6.  Prior to this, Johnson minimized his actions to friends and family, stating that he was "peaceful[]," "not an agitator," and merely "there to record history."  It is therefore unclear whether he has fully grasped the gravity of his individual actions.

Johnson clearly was an "agitator" when he called on fellow rioters to use a bust of George Washington as a battering ram to break down the doors to the House Chamber, where U.S. Representatives were trapped, in fear of their lives.  And storming past barricades and lines of police, getting tear gassed in the process, can hardly be considered "peaceful."  While the freedom to express political grievances and peacefully assemble is enshrined in the Constitution, Johnson's behavior as part of a mob is neither protected by the Constitution nor emblematic of civic duty.

Finally, Johnson has admitted to destroying evidence after the riot, including videos he took of a violent assault on law enforcement on Capitol grounds.  There is no explanation for that conduct other than to cover his tracks, and it amounts to another substantial aggravating factor in this case.  The nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B.  Johnson's History and Characteristics

As set forth in the PSR, Johnson's criminal history consists of a conviction for Possession of Marijuana when he was 19 years old and several traffic infractions.   PSR  ¶¶ 49-58. Accordingly, his criminal history is category I under the Guidelines.

It should be noted that Johnson has been in a cooperative posture ever since his voluntary surrender to the FBI on January 8, 2021, just two days after the riot.  His cooperation has consisted of: (1) debriefing with the government on January 15, 2021, and on September 16, 2021, in anticipation of a plea agreement; (2) turning over his cell phone to the FBI and providing consent to search it as well as his social media accounts (albeit after scrubbing them of inculpatory evidence); (3) being willing to testify in future proceedings; and (4) turning in an unlawfully converted short-barrel rifle at the government's request.[11]  During his proffer sessions, Johnson was forthcoming and provided valuable information.  Johnson's early and robust cooperation weighed heavily in the government's determination of its sentencing recommendation, which includes only a 90-day term of incarceration.

On the other hand, Johnson has expressed a desire to profit from his illegal conduct in the form of publishing a book regarding the events of January 6.  It is of course a basic premise that a criminal defendant should not profit from violating the law.  The Court therefore should take Johnson's financial motives into account when deciding, for example, whether to impose a fine.

Similarly, the PSR indicates that Johnson's wife is a doctor, and that their financial situation is so favorable that Johnson has not had to work for the past 11 years.  In addition, Johnson has privately retained not one, but two, reputable attorneys.  Surely, then, he can afford a

---

[11] The government will supplement this filing with a sealed addendum that will provide this Court with additional details regarding Johnson's cooperation.

substantial fine to reimburse taxpayers for his part in the mob that caused significant damage to the United States Capitol and has resulted in enormous burdens on the criminal justice system.

The defense will surely argue that, as the primary caretaker of five children, Johnson should not serve even a short period of incarceration.  Given the family's net worth of almost $475,000, including $16,000 in cryptocurrency, it is well within their means to hire someone to handle child care duties in the home during any period of incarceration.  *See* PSR ¶ 83.  Those expenses should be substantially lessened by the fact that all five children are school age and thus out of the house for a large portion of the day.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law.  "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."  FBI Director Christopher Wray, Statement before House Oversight & Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats. oversight.house.gov/files/Wray%20Testimony.pdf.  As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot.  *See United States v. Joshua Bustle and Jessica Bustle*, 1:21-cr-238 (TFH), Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation.  I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually – should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, i.e., the need to deter crime generally, and specific deterrence—the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

1.  *General Deterrence*

 The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.  Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration.  For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.  As this Court has explained when imposing sentence in another case: "I do think that it's important that there be a punishment deterrent, a component of whatever sentence I impose. And that it be a message to other people that if you're going to engage in this type of behavior that seeks to undermine and subvert our governmental processes there's a price to pay. Because if we don't do that then why shouldn't others do the same thing in the future?"  *United States v. Lori and Thomas Vinson*, 1:21-cr-355 (RBW), Oct. 22, 2021 Hr'g Tr. at 66:1-8.

The gravity of these offenses demands deterrence.  This was not a protest.  And it is important to convey to potential future rioters, especially those who intend to improperly influence the democratic process, that their actions will have consequences.   Indeed, this Court has previously emphasized that those who participated in the Capitol riot should not "receive a slap on the wrist" so that those inclined to "do something like what occurred on January 6th will think first before they do it."  *Id.* at 66:14-17.

In Johnson's case, there is possibly no greater factor that the Court should consider than general deterrence, particularly in light of the level of infamy he achieved through the viral photo of him carrying the Speaker's podium like a trophy amidst a violent riot. And more importantly, it is perfectly appropriate and indeed sanctioned by § 3553(a) to impose a sentence motivated in part by general deterrence. *See Russell*, 600 F.3d at 637 ("Subsections 3553(a)(2)(B) and (C) codify the penal goals of general and specific deterrence, requiring disincentives to match the severity of punishment to the harmfulness of the crime.")

2. *Specific Deterrence*

Johnson's actions on and after January 6 also demonstrate the need for specific deterrence for this defendant. Johnson knew police had deployed tear gas, and he ignored the blaring alarm resonating throughout the Capitol. He condoned the violence that day when he recorded a video of rioters assaulting law enforcement on Capitol grounds and encouraged rioters to break down the House Chamber doors with a "battering ram" when he knew Members of Congress were still inside. After the attack, Johnson downplayed his actions, stating that he was "peaceful[]" and performing his "responsibility as a citi[zen]." This, of course, is belied by the video evidence showing Johnson, along with others, breaching a police line and encouraging the destruction of property.

Although the government acknowledges that Johnson has been cooperative essentially from the start, his actions on January 6 underscore the need for specific deterrence in this case.

**E.  The Need to Avoid Unwarranted Sentencing Disparities**

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on law enforcement officers, to conspiracy to corruptly interfere with

Congress.[12]  Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind.  Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment.  The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes.  As such, a probationary sentence should not necessarily be the default.[13]  *United States v. Anna Morgan-Lloyd*, 1:21-cr-164 (RCL), Tr. 6/23/2021 at 19 ("I don't want to create the impression that probation is the automatic outcome here because it's not going to be.") (statement of Judge Lamberth).

The government and the sentencing courts have already begun to make meaningful distinctions between offenders.  For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long he remained inside, the nature of any statements he made (on social media or otherwise), whether he destroyed evidence of his participation in the breach, etc.—help explain the differing recommendations and sentences.  And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's

---

[12] Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[13]  Early in this investigation, the government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC), *United States v. Douglas K. Wangler*, 1:21-cr-00365(DLF), and *United States v. Bruce J. Harrison*, 1:21-cr-00365(DLF). The government is abiding by its agreements in those cases but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

"records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement.  *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).  Moreover, in cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").

Sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity.  *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007).   The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims.  Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the Court should consider the sentences imposed in *United States v. Derek Jancart and Erik Rau*, 1:21-cr-148 (JEB), for reference.  Jancart and Rau each received sentences of 45 days of incarceration.  They observed significant violence as they approached the Capitol building and laughed and cheered upon seeing it, while Johnson recorded a video of rioters

disarming a police officer.  Like Johnson, Jancart and Rau entered through the Senate Door shortly after it was breached.  While Jancart and Rau made their way to Speaker Pelosi's conference room, Johnson entered not one but three highly-sensitive areas of the Capitol: a Senate Wing office, Speaker Pelosi's office suite, and a vestibule just outside the doors to the House Chamber.

The government has requested, and the courts have imposed, sentences of incarceration in most cases where defendants gained entry to sensitive spaces inside of the Capitol Building.  *See, e.g.*, *United States v. Mazzocco*, 1:21-cr-54 (TSC) (sentenced to 45 days of incarceration where defendant entered conference room area known as Spouse's Lounge); *United States v. Pham*, 1:21-cr-109 (TJK) (sentenced to 45 days of incarceration where defendant walked into office area with desks, a computer, and numerous paper files); *United States v. Ericson*, 1:21-cr-506 (TNM) (sentenced to 20 days of weekend incarceration where defendant entered Speaker's conference room and other office space;); *but see United States v. Marquez*, 1:21-cr-136 (RBC) (government requested four months of incarceration for defendant who entered Senator Merkley's office; sentenced to 18 months' probation, citing mental health issues).

The Court should also consider the sentence it imposed in *United States v. William Tryon*, 21-cr-420, as a guidepost.  In that case, Tryon engaged in conduct that is no worse than Johnson's that day.  Specifically, Tryon: 1) stood face-to-face with police officers at the doorway to the Capitol and was pepper sprayed and hit with a baton when he tried to force his way in; 2) watched a rioter vandalize the Capitol by breaking a window; 3) gave a speech to a journalist that was posted on YouTube in which he likened the storming of the Capitol to the storming of the beach at Normandy and representing that "[t]his was nothing so far"; and 4) celebrated his actions on January 6, saying that "[i]t was awesome."  The Court ultimately sentenced Tryon,

who had pleaded guilty to the same charge as Johnson, to 50 days' incarceration and a $1,000 fine.

Like Tryon, Johnson breached a police perimeter and suffered the effects of tear gas. Like Tryon, Johnson witnessed rioters vandalize the Capitol. Unlike Tryon, however, Johnson entered a Senate Wing office and jiggled the handle of an office in Speaker Pelosi's suite—just across the hall from her barricaded staffers. And unlike Tryon, Johnson witnessed officers armed in riot gear being crushed in the vestibule to the House Chamber, and yet he stood there for over 10 minutes while rioters attempted to break down the doors. He even called on his fellow rioters to use a bust of George Washington as a battering ram to force open the doors— where on the other side House Representatives sheltered in place, terrified of the advancing mob. Being even a relatively passive part of a mob terrorizing Congress trapped inside the House Chamber surely is worse than merely entering a sensitive, but empty, space. For this reason alone, a prison term of 90 days for Johnson is merited and would not result in unwarranted sentencing disparities.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an

appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095.

V.    **Conclusion**

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, some of those factors support a sentence of incarceration and some support a more lenient sentence. Balancing these factors, the government recommends that this Court sentence Adam Johnson to 90 days' imprisonment, one year of supervised release, a $5,000 fine, $500 in restitution, and 60 hours of community service. Such a sentence promotes respect for the law, protects the community, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while still recognizing his early acceptance of responsibility.

Respectfully submitted,

MATTHEW GRAVES
UNITED STATES ATTORNEY


By:    /s/ Jessica Arco
       Jessica Arco
       D.C. Bar No. 1035204
       Trial Attorney – Detailee
       U.S. Attorney's Office
       555 4th Street NW
       Washington, DC 20530
       Jessica.arco@usdoj.gov